1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOE CALLAN, Individually and on
Behalf of All Others Similarly
Situated, et al.,

                    Plaintiffs,

          v.

MOTRICITY INC., et al.,

                    Defendants.

C11-1340 TSZ

ORDER

THIS MATTER comes before the Court on the motion of Defendants Motricity

Inc., Ryan K. Wuerch, James R. Smith, Jr., Allyn P. Hebner, James N. Ryan, Jeffrey A.

Bowden, Hunter C. Gary, Brett Icahn, Lady Barbara Judge, Suzanne H. King, and Brian

Turner (collectively "Motricity Defendants") to dismiss Plaintiffs' Second Amended

Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), docket no. 86, and

the motion of Defendants J.P. Morgan Securities, Goldman, Sachs & Co., Deutsche Bank

Securities Inc., RBC Capital Markets Corporation, Robert W. Baird Co. Inc., Needham &

Company, LLC, and Pacific Crest Securities LLC (collectively "Underwriter

ORDER - 1

1   Defendants") to dismiss Plaintiffs' Second Amended Complaint for failure to state a

2   claim under Fed. R. Civ. P. 12(b)(6), docket no. 90.  The Court, having considered the

3   Defendants' motions and all pleadings filed in support of and opposition to the motions,

4   and having heard oral argument on December 14, 2012, enters the following Order.

5   **I.   <u>Summary</u>**

6       On June 17, 2010, Motricity conducted an Initial Public Offering (IPO), offering

7   approximately 6 million shares of the company's stock to the public at a price of $10 a

8   share.  Second Amended Complaint ("SAC"), docket no. 82, at ¶ 1.  In connection with

9   the IPO, the company issued a registration statement and an offering prospectus

10  (collectively, the "Registration Statement").  The stock reached a class period high of

11  $30.47 per share in November 2010, before falling precipitously in the second half of

12  2011.  <u>Id.</u> at ¶ 5; <u>see also</u> Plaintiffs' Opposition, docket no. 92, at 1.  On July 11, 2012,

13  when this lawsuit was filed, Motricity stock was trading at $0.61 per share.  SAC at ¶ 5.

14      Plaintiffs Cliff Mosco and Rich Hardy allege violations of the Securities Act of

15  1933 and the Securities Exchange Act of 1934 on behalf of themselves and a putative

16  class of shareholders who acquired Motricity common stock traceable to the Registration

17  Statement issued in connection with Motricity's IPO on June 17, 2010, and/or who

18  purchased or acquired Motricity common stock between June 18, 2010, and November

19  14, 2011 (the "Class Period").  The Plaintiffs allege that Motricity, the individual

20  corporate Defendants, and the IPO underwriters misrepresented or omitted material facts

21  about the company's products, the marketplace for its products, and its international

22  business in the Registration Statement.  Specifically, Plaintiffs allege that the Registration

23

Statement misrepresented or omitted material facts concerning (1) the rate of smartphone adoption among consumers, (2) the functionality of the mCore software product, and (3) the company's contract with Indonesian carrier XL Axiata.  Id. at ¶¶ 2, 34-44.

Plaintiffs additionally charge that the Motricity Defendants made a number of false and misleading statements and omissions during the class period.  They argue that Motricity made statements falsely suggesting that (1) its products provided internet access comparable to smartphones and provided other products and services that were relevant and useful to smartphone users, and (2) that Motricity's contract with XL Axiata and other Asian carriers were financially healthy and "on track."  SAC at ¶¶ 3, 46-78.  Finally, Plaintiffs allege that these false and misleading statements were made intentionally or with deliberate recklessness.  They rely on confidential witnesses and allegedly suspicious stock sales by individual defendants, along with the "core operations inference," to argue that the Court may infer scienter.

Defendants move to dismiss the SAC.[1]  For the reasons set forth in this Order, the Court GRANTS the Defendants' motions and dismisses Plaintiffs' claims.

## II.  **Background**

Motricity is a publicly owned company organized under the laws of Delaware and operating out of headquarters located in the State of Washington.  Form S-1 Registration

---

[1] The Moticity Defendants move to dismiss the SAC in its entirety.  Docket no. 86.  The Underwriter Defendants join in the Motricity Defendants' motion and separately move to dismiss the Section 11 and Section 15 claims against them.  Docket no. 90.

1   Statement, Escobar Decl. Ex. A, docket no. 88-1, at 9.[2]  Motricity provides products and

2   services that allow wireless carriers to deliver mobile data services to their mobile phone

3   subscribers.  SAC at ¶ 2; Registration Statement at 6.

4         On June 17, 2010, Motricity filed a Form S-1 registration statement and

5   prospectus in connection with its IPO.  SAC at ¶ 34; Registration Statement at 2.  At the

6   time of the IPO, Motricity's domestic customers included the four largest mobile phone

7   carriers in the United States: AT&T, Verizon Wireless, Sprint, and T-Mobile USA.

8   Registration Statement at 6.

9         At the time of the IPO, Motricity's major product offering was the mCore software

10   platform.  Registration Statement at 92.  The Registration Statement described the mCore

11   platform as enabling "wireless carriers to design, configure, customize, and implement

12   mobile data services . . . [facilitating] the distribution and use of mobile content and

13   applications, electronic commerce, and other mobile data marketing services."  Id.  In

14   layman's terms, the mCore platform allowed carriers to market and distribute mobile

15   content and applications to their subscribers through the carrier's custom portal—the

16   mobile equivalent of an internet browser homepage.

17         The Registration Statement included a statement reporting that "[t]he Yankee

18   Group estimates that the proportion of U.S. subscribers owning smartphones increased to

19

20

---

21   [2] All citations to documents submitted with the Declaration of Andrew R. Escobar in Support of Motricity
22   Defendants' Motion to Dismiss, docket no. 88, as exhibits A through EE are to the CM-ECF page
    numbers rather than the page numbers of the underlying document.

23

*12% in 2009 from 9% in 2008 and 6% in 2007*."[3]  SAC at ¶ 35.  It also described

Motricity's product as follows:

> We Power the Mobile Internet . . .  The entire Internet through a mobile
> optimized experience[.]
>
> . . . .
>
> *mCore Search*.  mCore Search, which we bundle with our other solutions,
> is a customizable search technology for the mobile Internet.  *A single
> search box enables mobile subscribers to search for any information,
> content or application on the Internet.*  Through deep integration with the
> wireless carrier's advertising platform, mCore Search provides the ability
> for carriers to serve targeted, relevant and contextual ads.
>
> *mCore Managed Web*.  mCore Managed Web provides mobile subscribers
> with an optimized, powerful and easy-to-use mobile web browsing
> experience."

Id. at ¶ 38; Registration Statement at 4, 90.  In addition, the Registration Statement

disclosed that Motricity had recently entered into a contract with XL Axiata, a wireless

carrier in Indonesia.  SAC at ¶ 40; Registration Statement at 89.

After the IPO, in the second half of 2010, Motricity entered into contracts with

several additional Asian carriers.  Specifically, Motricity entered into a contract with

Reliance Communications, a mobile operator in India, and four other Southeast Asian

carriers in the Axiata Group—Celcom, Dialog, Robi, and Hello.  Motricity Q3 2010

Earnings Conference Call of November 2, 2010 ("Q3 2010 Call"), Escobar Decl. Ex. G,

docket no. 88-7, at 6; Motricity Q4 2010 Earnings Conference Call of February 8, 2011

("Q4 2010 Call"), Escobar Decl. Ex. H, docket no. 88-8, at 7.

---

[3] A number of statements in the SAC are highlighted in bold.  The Court has retained this formatting in
this Order.

ORDER - 5

1    During the class period, Motricity's revenues were generated through two

2  avenues: professional services and managed services.  SAC at ¶ 49; Registration

3  Statement at 52.  Professional services revenue consisted of the initial fee to customize

4  and implement the software for the mobile carrier and any fees to further enhance and/or

5  customize the software during the term of the contract.  Registration Statement at 52.

6  Managed services revenue consisted of the monthly service fee charged to host and

7  manage the software platform.  Id.  Motricity's typical domestic contract included both a

8  fixed monthly managed services fee and a variable managed services fee based on factors

9  including the number of customers using the mCore platform each month, the aggregate

10  dollar volume or number of transactions processed, or specified rates for individual

11  services.  Id.

12    Motricity's contracts with Asian carriers were structured differently than its

13  domestic contracts.  Q4 2010 Call at 6 ("Our international agreements are fundamentally

14  different than those with our US partners. . . .  [O]ur agreements are structured with

15  strong participatory economics providing Motricity a percentage of mobile data services

16  revenues growth.")  Essentially, rather than providing a fixed monthly managed services

17  fee, these contracts were structured with a variable managed services fee based on usage.

18  Id. at 23 ("There are no guarantees in those contracts with the exception of some small

19  revenue guarantees from XL and Celcom."); JP Morgan Technology, Media and Telecom

20  Conference Management Discussion Section of May 17, 2011, Escobar Decl. Ex. I,

21  docket no. 88-9, at 4 ("Our contracts are structured with XL, Celcom, Robi, Hello, Dialog

22

23

ORDER - 6

to where we're making a percentage of every single dollar [of] mobile data services revenues outside of SMS.")

In the second half of 2010, Motricity also announced the introduction of its first product developed specifically for the smartphone market, mCore MobileCast. MobileCast Press Release of September 13, 2010, Escobar Decl. Ex. J, docket no. 88-10, at 2.  Motricity described the new product offering as "designed to give smartphone subscribers real-time, zero touch access to all the relevant content, applications, goods and services they care about most, directly to their 'phonetop.'"  Id.

During Motricity's Q4 2010 earnings call on February 8, 2011, Motricity's CEO, Ryan Wuerch, discussed the company's "strong Q4 and 2010 financial results" along with the company's "positive business outlook for 2011."  Q4 2010 Call at 4.  However, he also disclosed that Motricity's North American business had "flattened" because "there is adoption with smartphones that is happening faster than I think anyone really expected."  Id. at 5, 18.  Addressing the increased market share for smartphones, Wuerch announced the purchase by Motricity of Adenyo, a company focused on mobile advertising, marketing, and analytics solutions.  Id. at 7.  Wuerch explained that the Adenyo acquisition would "dramatically expand[] the new smartphone solutions we have available to both carriers and enterprises."  Id.

On May 3, 2011, Motricity released its first quarter 2011 financial results.  The company reported a net loss of $6.1 million.  SAC at ¶ 63.  The Q1 2011 press release and accompanying analyst call also announced strong international growth and projected that this trend would continue.  Id. at ¶¶ 63, 65.  A few weeks later, on May 17, 2011,

ORDER - 7

1    Motricity's CEO, Ryan Wuerch, and CFO, Allyn Hebner, participated in the Annual JP

2    Morgan Technology, Media and Telecom Conference.  The conference materials stated

3    that "[i]nternational deployments with XL, Celcom, Robi, Hello, Dialog and Reliance are

4    on track."  Id. at ¶ 67.

5         Motricity's profits continued to decline for the remainder of 2011.  In an August

6    2011 press release announcing the company's financial results for the second quarter of

7    2011, Motricity announced a loss of $4.3 million.  Id. at ¶ 69.  It attributed the lower than

8    projected earnings "to headwinds in our North American carrier business, increased

9    competition in the international market which impacted our ability to close new deals,

10   and a later than expected closing of the Adenyo transaction."  "Motricity Reports Second

11   Quarter 2011 Results," August 9, 2011, Escobar Decl. Ex. L, docket no. 88-12, at 9.

12   Also in August 2011, Motricity announced a major internal restructuring including the

13   termination and replacement of its CEO, CFO, and General Counsel.  SAC at ¶ 4.[4]

14        On November 14, 2011, Motricity announced its third quarter 2011 financial

15   results, which included the news that it would take a $162.3 million write-down,

16   including a $123.5 million reduction in goodwill, a $38.8 million charge for fixed and

17   intangible assets, and a $4.6 million restructuring charge.  Id. at ¶¶ 73-74.  In addition,

18   Motricity announced that it would incur five million dollars in non-recoverable past and

19   future costs associated with unprofitable contracts.  Id. at ¶¶ 4, 41, 74.  Finally, Motricity

20   also stated that it would reclassify $7.25 million in professional services revenue from the

---

22   [4] CEO and Motricity founder Ryan Wuerch was replaced by interim CEO Jim Smith.

ORDER - 8

1   previous year to managed services revenue in order to accurately reflect the nature of the

2   underlying contracts.  <u>Id.</u> at ¶ 75.

3          Six weeks later, on January 5, 2011, Motricity announced that it had terminated its

4   contract with XL Axiata on December 31, 2011.  SAC at ¶ 86.  A short time later,

5   Motricity announced the termination of its operations in India and the Asia Pacific

6   region.  <u>Id.</u>

7      **III.    <u>Standard</u>**

8          In order to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal

9   Rules of Civil Procedure, a plaintiff must allege "enough facts to state a claim for relief

10  that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

11  Dismissal is proper under Rule 12(b)(6) only "if it appears beyond doubt that the plaintiff

12  can prove no set of facts to support his claims."  <u>Manshardt v. Fed. Judicial</u>

13  <u>Qualifications Comm.</u>, 408 F.3d 1154, 1156 (9th Cir. 2005).  In reviewing the adequacy

14  of the complaint, the Court must accept all well-pleaded allegations as true, <u>South Ferry</u>

15  <u>LP, No. 2 v. Killinger</u>, 542 F.3d 776, 782 (9th Cir. 2008), and draw all reasonable

16  inferences in favor of the plaintiff.  <u>Twombly</u>, 550 U.S. at 555.  In other words, "[t]o

17  survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

18  as true, to state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S.

19  662, 678 (2009) (internal quotation omitted).  However, these tenants are "inapplicable to

20  legal conclusions."  <u>Id.</u>  Thus, a pleading that only offers "labels and conclusions" or "a

21  formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S.

22

23

1   at 555.  If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to

2   plausible, [the] complaint must be dismissed."  <u>Id.</u> at 570.

3          **IV.**   **<u>Section 11 Claims Against All Defendants</u>**

4          Section 11 creates a private remedy for any purchaser of a security if the

5   registration statement published in connection with the offering "contain[s] an untrue

6   statement of a material fact or omit[s] to state a material fact required to be stated therein

7   or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  To

8   prevail on a Section 11 claim, a plaintiff must prove "(1) that the registration statement

9   contained an omission or misrepresentation, and (2) that the omission or

10  misrepresentation was material, that is, it would have misled a reasonable investor about

11  the nature of his or her investment."  <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006, 1027 (9th Cir.

12  2005) (internal quotations omitted).   Section 11 "was designed to assure compliance with

13  the disclosure provisions of the Act by imposing a stringent standard of liability on the

14  parties who play a direct role in a registered offering."  <u>Herman & MacLean v.</u>

15  <u>Huddleston</u>, 459 U.S. 375, 381-82 (1983).  Under Section 11, "[l]iability against the

16  issuer of a security is virtually absolute, even for innocent misstatements," if the plaintiff

17  can show a material misstatement or omission.  <u>Id.</u> at 382.  Other Section 11 defendants

18  bear the burden of demonstrating due diligence.[5]  <u>Id.</u>

19  ——————————————

20  [5] Section 11 provides several due diligence defenses available to non-issuer defendants, <u>see</u> 15 U.S.C.
§ 77k(b).  Because defendants bear the burden of demonstrating the applicability of the due diligence
21  defenses, they are unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6).

22

23

ORDER - 10

"[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995). Thus, a court may only determine the issue of materiality as a matter of law where "the statement is so obvious that reasonable minds could not differ." Id. (internal quotations omitted).

Section 11 claims do not require an allegation of scienter and thus, generally, Rule 8(a) applies and the complaint need only provide a short and plain statement of the basis for the claim. Daou, 411 F.3d at 1027; see also Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994). However, a Section 11 claim that sounds in fraud must satisfy the particularity requirements of Rule 9(b). Rubke v. Capital Bankcorp LTD, 551 F.3d 1156, 1161 (9th Cir. 2009); Daou, 411 F.3d at 1027.

"'To ascertain whether a complaint sounds in fraud, [the court] must normally determine, after close examination of the language and structure of the complaint, whether the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of the claim.'" In re Rigel Pharmaceuticals, Inc. Sec. Litig., 697 F.3d 869, 885 (2012) (quoting Rubke, 551 F.3d at 1161). Similarly, a Section 11 claim sounds in fraud if it makes a "wholesale adoption" of the facts underlying a fraud claim. Daou, 411 F.3d at 1028; Rubke, 551 F.3d at 1161. Here, Plaintiffs specifically disclaim all "allegations of fraud or fraudulent conduct and/or motive" with respect to their Section 11 claims. SAC at ¶ 121. However, a plaintiff cannot escape the requirements of Rule 9(b) with a general disclaimer that a claim is based on negligence rather than fraud. Wagner v. First Horizon Pharm. Corp., 464 F.3d

1  1273, 1278 (11th Cir. 2006); In re Stratosphere Sec. Litig., 1 F.Supp.2d 1096, 1104 (D.

2  Nev. 1998).

3          Plaintiffs argue that Rule 9 does not apply to their Section 11 claims because they

4  "structured the SAC so that their Section 11 claims are alleged separately."  Opposition

5  to Motricity Defendants' Motion to Dismiss at 9; Opposition to Underwriters' Motion to

6  Dismiss, docket no. 93-1, at 5-6.  However, the central theory of the SAC is that the

7  Defendants engaged in a scheme to defraud investors by failing to disclose adverse facts

8  known to them about Motricity in order to enable some of the company's principal

9  shareholders to sell "over $11 million worth of their own Motricity stock at artificially

10  inflated prices."  SAC at ¶ 45.  These allegations are repeated in one form or another

11  throughout the SAC.  Id. at ¶¶ 91-93, 95, 96.  Although the Section 11 claim does not

12  adopt all of the allegations contained in the rest of the complaint, it does not allege

13  different misrepresentations or omissions.  Compare SAC ¶¶ 34-44 with SAC ¶¶ 113-116

14  (Count I) and SAC ¶¶ 119-129 (Count III).  Further, Plaintiffs expressly reincorporate by

15  reference at paragraph 119 of the SAC the same alleged misrepresentations in the

16  Registration Statement that are central to Plaintiffs' fraud claims.   The Court concludes

17  that the SAC "'alleges a unified course of fraudulent conduct' and 'relies entirely on that

18  course of conduct as the basis of [the Securities Act claims],'" and therefore "sounds in

19

20

21

22

23

ORDER - 12

1   fraud." <u>See</u> <u>Rubke</u>, 551 F.3d at 1161 (citations omitted); <u>see also</u> <u>In re Daou</u>, 411 F.3d at

2   1028.[6]

3          Rule 9(b) provides, "[i]n all averments of fraud or mistake, the circumstances

4   constituting fraud or mistake shall be stated with particularity."  "In order to allege fraud

5   with particularity, the complaint must both identify the allegedly fraudulent statement and

6   explain why it was false when made." <u>In re Metropolitan Sec. Litig.</u>, 532 F.Supp.2d

7   1260, 1279 (E.D. Wash. 2007) (citing <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1547-

8   48 (9th Cir. 1994)).  To adequately identify a statement for purposes of Rule 9 the

9   Plaintiff must set forth facts such as the statement's contents, the time and place at which

10  it was made, and the party who made it.  <u>Id.</u>  The Defendants argue that Plaintiffs'

11  Section 11 claims fail because they have not alleged any materially misleading statements

12  or omissions in the Registration Statement and they have not satisfied the pleading

13  requirements of Rule 9(b).

14          ***1.  Smartphone Adoption***

15          Plaintiffs first allege that the Registration Statement was materially misleading

16  because it stated a rate of smartphone adoption that was false and failed to disclose the

17  correct rate of smartphone adoption.  SAC at ¶¶ 34-37.  The statement at issue reads:

18          The Yankee Group estimates that the proportion of U.S. subscribers owning
            smartphones increased to ***12% in 2009 from 9% in 2008 and 6% in 2007***.
19          The share of smartphones as a percentage of the overall mobile device

20  _____

21  [6] The Court further concludes that even under the more relaxed pleading standard of Rule 8, the Plaintiffs
    have failed to state a claim under Section 11.  As discussed below, Plaintiffs have failed to allege facts
22  supporting a reasonable inference that the Registration Statement contained any false or misleading
    statements or omitted to state a material fact necessary to make the statements therein not misleading.

23

market is projected to continue growing.  With the advent of the Internet and the evolution of wireless networks and mobile phones, mobile subscribers have increased their demand for mobile content, including information, images, music and video, and for mobile applications, including games and productivity tools.  Id. at ¶ 35.

Plaintiffs claim that this statement is false because The Nielsen Company, another independent consulting group, reported on August 2, 2010, that the rate of smartphone adoption in the U.S. mobile phone market was 21% by the end of 2009, 23% by the first quarter of 2010, and 25% by the second quarter of 2010.  Id. at ¶ 36.

In order to be actionable under Section 11, a plaintiff must demonstrate that the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  Daou, 411 F.3d at 1027 (citing 15 U.S.C. § 77k(a)).  This statement is not actionable because it is not presented as a statement of fact, but rather as an unverified estimate by a third party.  Moreover, the alleged omission of the "correct" rate of smartphone adoption is also not actionable because the estimates by The Nielsen Company had not been published at the time that the Registration Statement was issued.

Plaintiffs argue that the incorrect estimates of smartphone adoption included in the Registration Statement are actionable even though the Nielson Company statistics were not published until after the IPO because the statistics relate to the period of time prior to the IPO and therefore the "higher adoption rate was not a 'future' fact, but was an existing fact that rendered the numbers Motricity did report" misleading.  Opposition to Motricity Defendants' Motion to Dismiss at 10.  This argument is creative, but ultimately

futile.  Plaintiffs have not alleged in the SAC any source for the "correct" estimate of smartphone adoption that existed at the time the Registration Statement was published.

Plaintiffs alternatively argue that the Defendants were negligent for failing to discover and disclose the correct statistics concerning the rate of smartphone adoption. They argue that the Nielson Company published a blog post on June 4, 2010, stating that 21% of mobile subscribers in the U.S. had adopted smartphones by the end of 2009. Response to the Underwriters' Motion to Dismiss at 11 n.8.  This argument is also unpersuasive.  First, this fact is not alleged in the complaint.  However, even if the statistic from this blog post was included in the complaint, it would still not be actionable.  The estimates attributed to the Yankee Group were just that, estimates.  The fact that the Underwriters did not discover or include a different estimate, published by a different third party consulting group, is not a basis for liability under Section 11.  In addition, the SAC does not plead facts supporting a reasonable inference that the figures published by the Nielsen Company were correct and the estimates published by the Yankee Group were incorrect.

Any argument that the Defendants were required to use a different study or review other sources of data is also belied by the case law.  In <u>Rigel Pharmaceuticals Inc. Securities Litigation</u>, the Ninth Circuit affirmed the District Court's conclusion that the "Plaintiff had failed to adequately plead a false statement . . . because disagreements over statistical methodology and study design are insufficient to allege a materially false statement."  697 F.3d at 877.  The court reasoned that

1

2

3
> Plaintiff's allegations of "falsity" essentially are disagreements with the statistical methodology adopted by the doctors and scientists who designed and conducted the study, wrote the journal article, and selected the article for publication.  The allegations therefore concern two different judgments about the appropriate statistical methodology to be used by Defendants.  The allegations are not about false statements.

4

5
<u>Id.</u>  Similarly here, Plaintiffs allege that the Underwriters should have chosen to rely on a

6
different study.  Assuming for purposes of argument only that the blog post showing

7
Nielsen's estimates was available prior to Motricity's IPO, Plaintiffs have failed to

8
establish that the Defendants had a duty to include the results of this study in the

9
Registration Statement.  <u>Id.</u>; <u>see also</u> <u>Padnes v. Scios Nova Inc.</u>, 1996 WL 539711, at *5

10
(N.D. Cal. 1996) (Concluding that "where a company accurately reports the results of a

11
scientific study, it is under no obligation to second guess the methodology of that

12
study.").

13
Plaintiffs also argue that the Registration Statement was misleading because

14
Defendants failed to disclose that "a dramatic shift in smartphone adoption had occurred

15
just months earlier."  SAC at ¶¶ 34, 61, 62.  They allege that this omission is actionable

16
because, Ryan Wuerch, Motricity's CEO, admitted in March 2011 that "a dramatic shift

17
in smartphones had occurred 14 months earlier."  <u>Id.</u> at ¶¶ 37, 62.  First, this argument

18
fails because the alleged statement is one of hindsight, and fraud by hindsight is not

19
actionable.  <u>In re Metawave Communications Corp. Sec. Litig.</u>, 629 F.Supp.2d 1207,

20
1219 (W.D. Wash. 2009) (citing <u>Ronconi v. Larkin</u>, 253 F.3d 423, 430 n.12 (9th Cir.

21
2001).  Plaintiffs do not claim that Wuerch stated that he had recognized a dramatic shift

22
in smartphone use 14 months earlier, when the shift allegedly occurred.  Rather, in the

23

ORDER - 16

allegedly misleading statement Wuerch recognized, from the vantage of March 2011, that a shift in smartphone use had occurred fourteen months earlier. The alleged omission of this information from the Registration Statement is classic fraud by hindsight.

Moreover, Wuerch's statement in March 2011 concerning the consumer shift toward smartphone adoption is quoted out of context. The transcript from the Lazard Capital Markets Technology & Media Conference reveals that Wuerch was discussing the ongoing shift from market control by mobile operators to market control by device manufacturers. Lazard Capital Markets Technology & Media Conference Transcript, Escobar Decl. Ex. K, docket no. 88-11, at 4-5. Read in context, Wuerch's statement is ambiguous at best and fails to support the inference that Defendants knew, at the time the Registration Statement was issued, that "a dramatic shift in smartphone adoption had occurred just months earlier."

Finally, Plaintiffs' claims related to the rate of smartphone adoption also fail because the Registration Statement specifically warned potential investors that there was an overall upward trend in smartphone adoption and that this trend could negatively impact Motricity's business. See, e.g., Registration Statement at 9, 19-20 ("The majority of our revenue is based on mobile subscribers accessing mobile content and applications through our customers' carrier-branded mobile solutions. However, with the growth of the iPhone and smartphone business models, our customers' services may be bypassed or become inaccessible."), 85.

For the foregoing reasons, the Court concludes that the Plaintiffs' Section 11 claim concerning the rate of smartphone adoption fails as a matter of law.  Accordingly, this claim must be dismissed.

### 2. *Functionality of mCore Platform*

Plaintiffs next allege that the Registration Statement was misleading because it misrepresented the functionality of Motricity's mCore platform as providing unlimited access to the internet, when that was not the case.  SAC at ¶¶ 38-39.  In a full page advertisement with color graphics at the beginning of the Registration Statement Motricity stated "We Power the Mobile Internet. . . .  The entire internet through a mobile optimized experience."  Id. at ¶ 38; Registration Statement at 4.  The Registration Statement also included the following description of products within the mCore software suite:

> mCore Search.  mCore Search, which we bundle with our other solutions, is a customizable search technology for the mobile Internet.  *A single search box enables mobile subscribers to search for any information, content or application on the Internet.*  Through deep integration with the wireless carrier's advertising platform, mCore Search provides the ability for carriers to serve targeted, relevant and contextual ads.
>
> mCore Managed Wed.  mCore Managed Wed provides mobile subscribers with an optimized, powerful and easy-to-use mobile web browsing experience.

SAC at ¶ 38; Registration Statement at 90.

Plaintiffs allege that, contrary to these statements in the Registration Statement, "Motricity's mCore products did not provide access to the 'entire Internet,' but were instead used by their carrier customers to provide limited internet access which did not

ORDER - 18

1    allow downloading of content files and restricted subscribers to downloading content or

2    files from the carrier's 'walled garden.'"   SAC at ¶ 39.   Plaintiffs allege that this

3    misrepresentation was material because it falsely suggested that the mCore platform

4    could provide internet access on par with smartphones.   Id.

5           Defendants move to dismiss this claim, arguing that the statements about mCore's

6    functionality are not false or misleading and that contemporaneous disclosures in the

7    Registration Statement warned investors that the user experience was dictated by the

8    carrier's customization of the product.   They argue that (1) mCore could be used to

9    provide access to the entire internet, (2) the Registration Statement disclosed that the

10   mCore platform was "modified, configured, or customized" by carriers, and (3) the

11   Registration Statement disclosed the risk posed to Motricity by the "open access" internet

12   available on smartphones.   In addition, the Defendants argue that information already in

13   the public domain and facts known or reasonably available to shareholders at the time of

14   the IPO relieved the Defendants of any duty to further disclose the functionality of the

15   mCore product.

16          The Plaintiffs' functionality claim fails for several reasons.   First, Plaintiffs have

17   failed to respond to Defendants' argument that the mCore software platform "was

18   capable of providing access to the entire version of the internet that could be viewed from

19   a mobile phone."   Reply in Support of Motricity Defendants' Motion to Dismiss at 10.

20   Failure of a party to address a claim in an opposition to a motion may constitute a waiver

21   of that claim.   See Abogados v. AT & T, Inc., 223 F.3d 932, 937 (9th Cir. 2000); Foster

22   v. City of Fresno, 392 F.Supp.2d 1140, 1147 n.7 (E.D. Ca. 2005).   Here, because

23

ORDER - 19

Plaintiffs failed to respond to Defendants' argument in any fashion, the Court may construe this as an abandonment of any argument against dismissing the claim.[7]

This argument also fails because the Registration Statement adequately disclosed that any limitation to subscribers' internet access was not a result of mCore's capabilities, but rather, was a result of the way in which Motricity's carrier customers customized the software platform. The Registration Statement included the following disclosures:

> Actual user interfaces vary in appearance per carrier requirements. The user interface representations depicted demonstrate the functional capabilities of the mCore Platform. Registration Statement at 4.

> Wireless carriers can select from some or all of our services to construct and deliver a customized, carrier-branded, and highly personalized data experience. Id. at 7.

> The mCore service delivery platform enables wireless carriers to design, configure, customize, and implement mobile data services. Id. at 92.

These disclosures informed investors that the subscribers' experience of the mCore platform was ultimately dictated by the carriers' design, configuration, and customization of the product.

The Defendants also point out that the Registration Statement warned investors of the risk posed by open operating systems and smartphones.

> ***Open mobile phone operating systems and new business models may reduce the wireless carriers' influence over access to mobile data services, and may reduce the total size of our market opportunity.***

> The majority of our revenue is based on mobile subscribers accessing mobile content and applications through our customers' carrier-branded

---

[7] In addition, Plaintiffs' counsel was given another opportunity to respond to this argument at oral argument and he failed to offer any response.

ORDER - 20

mobile solutions.  However, with the growth of the iPhone and smartphone business models, our customers' services may be bypassed or become inaccessible.  These business models, which exclude carrier participation beyond transport, along with the introduction of more mobile phones with open operating systems that allow mobile subscribers to browse the Internet and, in some cases, download applications from sources other than a carrier's branded services, create a risk that some carriers will choose to allow this non-branded internet access without offering a competitive value-added carrier-branded experience as part of their solution set.  These so-called "open operating systems" include Symbian, Blackberry, Android, Windows Mobile, and webOS.  We believe wireless carriers need to offer branded services that can compete head-to-head with the new business models and open technologies in order to retain mobile subscribers and increase ARPU.  Although our solutions are designed to help wireless carriers deliver a high value, competitive mobile data experience, if mobile subscribers do not find these carrier-branded services compelling, there is a risk that mobile subscribers will use open operating systems to bypass carrier-branded services and access the mobile Internet.  It is also possible one or more wireless carriers adopt a non-carrier branded, third-party web portal model.  To the extent this occurs, the total available market opportunity for providing our current services and solutions to carriers may be reduced.

Id. at 20.  Defendants argue that this disclosure put investors on notice that Motricity's carrier customers had the capability of limiting their subscribers' mobile internet access. While this disclosure is not the model of clarity, it does communicate that Motricity's mCore product was different from the "open operating systems" and smartphones.

The Court concludes that the statements in the Registration Statement that mCore provided access to the "entire Internet" and the ability "to search for any information, content or application on the Internet" were not false or misleading.  These statements are descriptions of mCore's "functional capabilities."  Id. at 4.  They do not purport to inform investors how wireless subscribers ultimately experienced the mCore product.

ORDER - 21

1    Moreover, these statements are not misleading because the Registration Statement

2    disclosed that wireless carriers could select "some or all" of Motricity's services, and that

3    they could use the services to "construct and deliver a customized, carrier-branded" user

4    experience.  Id. at 7.  The Registration Statement adequately informed investors that the

5    mCore platform was customized by carriers and was not necessarily deployed to its full

6    functional capacity.

7    The essence of Plaintiffs' functionality claim is that the Registration Statement

8    suggested to investors that Motricity's product provided comparable internet access to

9    smartphones.  The statements identified by Plaintiffs, read in conjunction with the

10   remainder of the Registration Statement, do not support this argument.  The disclosure

11   found at page 20 of the Registration Statement warned that

12       with the growth of the iPhone and smartphone business models, our
         customers' services may be bypassed or become inaccessible.  These
13       business models, which exclude carrier participation beyond transport,
         along with the introduction of more mobile phones with open operating
14       systems that allow mobile subscribers to browse the Internet and, in some
         cases, download applications from sources other than a carrier's branded
15       services, create a risk that some carriers will choose to allow this non-
         branded internet access without offering a competitive value-added carrier-
16       branded experience as part of their solution set.

17   This constitutes a disclosure that mCore is not an open operating system.  It further

18   communicates that smartphones provided competition to the carrier-branded services

19   which Motricity provided.  No further disclosure was required.[8]

20

21   _____

22   [8] Defendants also argue that, to the extent the Registration Statement did not adequately disclose that
     wireless carriers used mCore to provide limited internet access, they should be relieved of any liability
     because at the time that Motricity issued the Registration Statement it was widely known that carriers

23

1    Finally, Plaintiffs also allege the Registration Statement misrepresented

2    Motricity's "smartphone solution."  SAC ¶ at 39.  Because the SAC does not adequately

3    identify the "smartphone solution," or identify any misleading statement or omission in

4    the Registration Statement concerning this "smartphone solution," this claim fails the

5    pleading requirements of Rule 9(b).

6         To summarize, the Court concludes that Plaintiffs have failed to allege sufficient

7    facts to support their claim that Motricity's statement that it provided access to the "entire

8    Internet" was false, or that this statement was misleading absent a further disclosure that,

9    as actually deployed by Motricity's carrier customers, the mCore product provided only

10   limited "walled garden" internet access.   As the Court understands the contours of this

11   claim, the statements concerning the functionality of the mCore product were not false,

12   and contemporaneous disclosures adequately informed investors that wireless carriers

13   customized the product to their specifications.   Therefore, this claim is dismissed.

14   **_3.   XL Axiata Contract_**

15        Plaintiffs allege that the Registration Statement falsely portrayed Motricity's

16   contract with XL Axiata as an example of its expanding international business and

17   scalable platform.  SAC at ¶ 40.  To support their argument Plaintiffs juxtapose

18   statements in the Registration Statement touting mCore's "scalable platform" and

19

20

---

21   such as AT&T Wireless and Verizon provided "walled garden" internet access.  The Court concludes that
     it is unnecessary to reach this argument given the analysis above.

22

23

"flexible modular architecture" with later, post-IPO, statements allegedly conceding that

the XL Axiata contract was ultimately unprofitable.

Specifically, Plaintiffs allege that the following paragraph in the Registration

Statement was false and misleading.

> We intend to expand our business in developed and emerging international markets, such as those in Southeast Asia, India and Latin America. We recently entered into an agreement with XL Axiata, a wireless carrier in Indonesia. We intend to apply our expertise gained from the U.S. market and fully leverage the capabilities and scale of the mCore platform to enable the rapid deployment of advanced mobile data services in these new markets in a cost-effective and efficient manner.

SAC at ¶ 40. Plaintiffs then point to a statement by Motricity CFO, Steve Cordial, in

November 2011, discussing the company's spending commitments for some of those

contracts.

> [W]e looked at a number of contracts that had reached, or recently reached their the [sic] minimum levels and then *got a look at what the commitments were that we made to those customers for future spending, and realized that we had made commitments for a lot more spending, than we saw as committed revenues coming into the future. We took the standard GAAP approach to that, and recognized the cost in excess of minimum revenues, in this period.*

<u>Id.</u> at 41. Plaintiffs infer that Cordial's statement is an admission that the XL Axiata

contract did not include profitable terms when negotiated in 2010. <u>Id.</u> at 42. They use

this alleged admission to argue that the Registration Statement "failed to disclose that

Motricity had committed itself to an unprofitable contract with XL Axiata" and "failed to

disclose the extensive incompatibility between Motricity's software and the Asian

carriers' technology and business requirements." <u>Id.</u> at ¶ 44.

1    The Court concludes that the reference in the Registration Statement to an

2  "agreement with XL Axiata" was not false or misleading when made.  First, Plaintiffs

3  have failed to identify any authority supporting their argument that Defendants had a duty

4  to include further details about the XL Axiata contract in the Registration Statement.  For

5  this reason alone, Plaintiffs' claim fails.

6    In addition, Cordial's statement in November 2011 does not support Plaintiffs'

7  claim that Motricity knew, in June 2010, that the contract with XL Axiata was, or would

8  be, unprofitable.  Cordial's statement concerning the status of Motricity's Asian contracts

9  was the Q3 2011 Analyst Call held on November 14, 2011.  The quote is an excerpt from

10  an exchange with an analyst from Sterling Auty.  The exchange, in full, reads as follows:

11      Q.  Hey guys.  This is Lauren Choi for Sterling Auty.  I guess, my first
       question is Axiata, I think in the past you guys have talked about a
12      minimum threshold.  And I think it was kind of our impression that we
       wouldn't be reaching the kind of minimum threshold and after that because
13      of volumes, we get some uptick.  And just first of all, did we reach that
       point yet?  And if not, is it because we've seen delays or the volume hasn't
14      been there?  Or just wanted also an update if the contract has changed at all
       there?

15
       A.  Lauren, this is Steve [Cordial].  I'm not sure that it's been the
16      company's policy to comment on specific customer relationships.  But we
       looked at a number of contracts that had reached or recently reached their
17      minimum levels and then got a look at what the commitments were that
       we've made to those customers for future spending.  And we realized that
18      we had made commitments for a lot more spending than we saw as
       committed revenues coming in the future.  So we took the standard GAAP
19      approach to that and recognized the cost in excess of minimum revenues in
       this period.
20
       Q.  Okay.  And in terms of, I guess, just color around ex-Axiata have we
21      kind of moved along faster than we had expected or on target, below target?

22

23

ORDER - 25

1       A.  Yeah, so XL continues to stay on track, so that has not changed.  We've
        launched Celcom so they're in the early stages so I believe we're currently
2       on target although early state, right, is just coming in from Celcom. . . .

3    Q3 2011 Earnings Call, Escobar Declaration Ex. P, docket no. 88-16, at 8.

4           In context, Cordial's statement does not support Plaintiffs' contention.   First, the

5    portion of Cordial's answer quoted in the SAC can only be interpreted as referring to the

6    contracts in the Axiata group, not the individual XL Axiata contract.   As such, the

7    statement does not support Plaintiffs' claim that Defendants knew in June 2010 that the

8    XL Axiata contract was unprofitable.   Second, Cordial went on to confirm that the XL

9    Axiata contract "continues to stay on track," contradicting Plaintiffs' claim that Motricity

10   had "committed itself to an unprofitable contract with XL Axiata"

11          Plaintiffs also allege that the Registration Statement was misleading because it

12   "failed to disclose the extensive incompatibility between Motricity's software and the

13   Asian carriers' technology and business requirements."   This claim is also without merit.

14   Motricity entered into the contract with XL Axiata just prior to the IPO.   As a result,

15   Plaintiffs have not, and cannot, point to any facts to support their claim that Motricity

16   knew, at the time of the IPO, of the alleged incompatibility between the Motricity

17   software and "the Asian carriers' technology and business requirements."   Motricity did

18   not enter into any additional contracts with Asian carriers until after the IPO.   As such, it

19   is not reasonable to suggest that Motricity should have disclosed in the registration

20   statement alleged technical incompatibilities between the Motricity software and the

21   Asian market.

22

23

ORDER - 26

Simply put, Plaintiffs' claim that Motricity should have disclosed the terms of its contract with XL Axiata and the technical details of implementing the contract in the Registration Statement is without merit.  Plaintiffs have not pointed to any caselaw or other authority requiring this.  Moreover, Plaintiffs have failed to demonstrate that the allegedly omitted facts were material.  The Registration Statement merely listed the fact of the XL Axiata contract.  It did not project the profitability of the contract or otherwise provide any details with respect to the contract.  In addition, the Registration Statement warned that Motricity faced numerous risks associated "with international sales and operations."  Registration Statement at 25.  These included a statement that Motricity has

> limited experience operating in foreign jurisdictions and are rapidly building our international operations.  Operating in international markets requires significant management attention and financial resources.  The investment and additional resources required to establish operations and manage growth in other countries may not produce desired levels of revenue or profitability.

Id.  The failure to disclose the specifics of the XL Axiata contract was not a material omission as a matter of law.  Accordingly, this claim is dismissed.

### 4. *Section 11 Conclusion*

The Plaintiffs' Section 11 claims are dismissed in their entirety.  When dismissing a complaint for failure to state a claim, the district court should grant leave to amend "unless [the court] determines that the pleading could not possibly be cured by the allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995)).  The Ninth Circuit has suggested that the leave to amend is intended to provide an opportunity to cure "technical defects,"

ORDER - 27

1  and has emphasized that "[c]ourts are not required to grant leave to amend if a complaint

2  lacks merit entirely." <u>Lopez</u>, 203 F.3d at 1129.  Thus, if there is a clear legal or factual

3  bar to the plaintiff's claims that cannot be overcome by additional facts, leave to amend

4  need not be granted.

5      Here, Plaintiffs' claims that the Registration Statement contained false or

6  misleading statements about the rate of smartphone adoption and the company's contract

7  with XL Axiata are dismissed with prejudice and without leave to amend.  Plaintiffs have

8  failed, as a matter of law, to allege sufficient facts to state a claim on these issues.  As

9  such, the deficiency in these claims cannot be overcome by additional facts and any

10  attempt to amend the pleadings would be futile.[9]

11      The Plaintiffs' Section 11 claim based on the allegation that Motricity

12  misrepresented the functionality of its mCore product to investors by omitting material

13  information from its disclosures is dismissed without prejudice and with leave to amend.

14  **V.    <u>Section 10(b) Claims Against Motricity Defendants</u>**

15      In addition to their Section 11 claims based on the Registration Statement,

16  Plaintiffs claim that the Motricity Defendants made a number of false and misleading

17  statements after the IPO in violation of Section 10(b) and SEC Rule 10b-5.  The post-IPO

18  statements fall into two categories: (1) Motricity's product's support for and functionality

19  _____

20  [9] The Court also notes that Plaintiffs have twice previously amended their complaint in response to a
    motion to dismiss.  This is the third time the Defendants have filed a motion to dismiss.  <u>See</u> docket nos.

21  50, 69.  The first two motions to dismiss were voluntarily withdrawn in order for Plaintiffs to amend their
    complaint.  <u>See</u> docket nos. 62, 80.  Thus, although this is the first time the Court has dismissed Plaintiffs'

22  complaint, they have not been denied the opportunity to amend their complaint in response to Defendants'
    arguments.

23

ORDER - 28

1   with smartphones, and (2) Motricity's contract with XL Axiata, entry into the Asian

2   market, and the division of revenues between managed services and professional services

3   in these contracts.  Id. at ¶¶ 3, 46-78.

4          Section 10(b) of the Exchange Act makes it unlawful for any person to "use or

5   employ, in connection with the purchase or sale of any security . . .  any manipulative or

6   deceptive device or contrivance[.]"  15 U.S.C. § 78j(b).  SEC Rule 10b–5 imposes

7   liability on any person who "make[s] any untrue statement of a material fact" or "omit[s]

8   to state a material fact necessary in order to make the statements made, in light of the

9   circumstances in which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  To

10  bring a claim under Rule 10b-5, the plaintiff must show: (1) a material misrepresentation

11  or omission; (2) made with a wrongful state of mind ("scienter"); (3) in connection with

12  the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

13  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

14         To be actionable, a misrepresentation of a fact, or an omission of a fact, must be

15  material.  Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988).  The Supreme Court recently

16  confirmed that there is no bright-line rule for determining whether information is material

17  as a matter of law.  Matrixx Initiatives, Inc. v. Siracusano, __U.S. __, 131 S.Ct. 1309,

18  1318-23 (2011).  In Matrixx, the Court held that assessing materiality is not a test of

19  "statistical significance," but rather involves a "fact-specific inquiry . . . that requires

20  consideration of the source, content, and context" of the allegedly misleading fact or

21  omission.  Id. at 1321.  The misrepresentation of a fact is material if there is a substantial

22  likelihood that a reasonable shareholder would consider it important in making an

23

ORDER - 29

1    investment decision.  <u>Basic</u>, 485 U.S. at 231.  For an omission to be material, there must

2    be a substantial likelihood that the disclosure of the omitted fact would have been viewed

3    by a reasonable investor as having significantly altered the "total mix" of information

4    made available.  <u>Id.</u> at 232.

5         A complaint stating claims under Section 10(b) and Rule 10b–5 must satisfy the

6    heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private

7    Securities Litigation Reform Act of 1995 ("PSLRA").  <u>Zucco Partners, LLC v. Digimarc</u>

8    <u>Corp.</u>, 552 F.3d 981, 990 (9th Cir. 2009).  Under the PSLRA, "the complaint shall

9    specify each statement alleged to have been misleading, the reason or reasons why the

10   statement is misleading, and, if an allegation . . . is made on information and belief, the

11   complaint shall state with particularity all facts on which that belief is formed. . . ."  15

12   U.S.C. § 78u–4(b)(1).  "The plaintiff must attribute the misleading statements upon

13   which the claim is based to a particular defendant."  <u>In re CoinStar Inc. Sec. Litig.</u>, 2011

14   WL 4712206, at *3 (W.D. Wash. 2011); <u>see also</u> <u>Janus v. First Derivative Traders</u>,

15   __ U.S. __, 131 S.Ct. 2296, 2303 (2011) (The "maker of a statement is the entity with

16   authority over the content of the statement and whether and how to communicate it.").  In

17   addition, the PSLRA requires that the complaint "state with particularity facts giving rise

18   to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.

19   § 78u-4(b)(2).

20        To adequately plead scienter, the complaint must allege facts that, when taken as

21   true and assessed collectively, raise a strong inference that the defendant possessed actual

22   knowledge or acted with deliberate recklessness.  <u>Zucco Partners</u>, 552 F.3d at 991.  When

23

ORDER - 30

1    "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the

2    court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor

3    Issues and Rights, Ltd., 551 U.S. 308, 323 (2007).  A securities fraud complaint will

4    survive a motion to dismiss under Rule 12(b)(6) "only if a reasonable person would deem

5    the inference of scienter cogent and at least as compelling as any opposing inference one

6    could draw from the facts alleged."  Id. at 324.

7         Plaintiffs rely principally on the "core operations inference" to allege scienter.

8    Opposition to Motricity Plaintiffs' Motion to Dismiss at 29.  To a lesser extent, Plaintiffs

9    rely on the allegations of four confidential witnesses, SAC at ¶¶ 81-85, 87, and the stock

10   sales of  individual defendants, id. at ¶¶ 96-98.

11        ***1.  Core Operations Inference***

12        Where plaintiffs allege that senior executives must have knowledge of certain core

13   operations or important transactions because they are so integral to the operations of the

14   company that knowledge thereof cannot reasonably be denied, courts have applied the

15   "core operations inference" to infer scienter with respect to senior executives based on

16   their positions within the company.  See Berson v. Applied Signal Technology, 527 F.3d

17   982, 987 (9th Cir. 2008); No. 84 Employer–Teamster Joint Council Trust Fund v.

18   American West Holding Corp., 320 F.3d 920, 943 n.21 (9th Cir. 2003).  Prior to Berson it

19   was unclear whether the core operations inference was available in the Ninth Circuit.

20   Berson clarified that, in some circumstances, plaintiffs' allegations of specific facts to

21   support the inference that the alleged statements were misleading when made is sufficient

22

23

to support the PSLRA's requirement that scienter be pleaded with particularity.  <u>Berson</u>, 527 F.3d at 988-89.

The role of the "core operations inference" was further clarified by the Ninth Circuit in <u>South Ferry</u>.  There, the Court concluded that for position-based allegations to satisfy the PSLRA, plaintiffs must "bridge the gap" between a defendant's mere access to information and an inference of knowledge.  <u>South Ferry</u>, 542 F.3d at 783.  In most cases, this will require the allegation of additional particularized facts about the defendants— including facts such as a defendant's own public statements, confidential witness reports about a defendant's specific activities, or allegations of insider trading.  <u>Id.</u> at 785.  Only in rare circumstances, "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," will allegations based on the core operations inference, without more, satisfy the PSLRA's scienter requirement.  <u>Id.</u> at 786.

### 2. *Confidential Witnesses*

Plaintiffs rely on the statements of four confidential witnesses ("CWs") in their complaint.  A complaint relying on statements from confidential witnesses to establish scienter must pass two hurdles to satisfy the PSLRA pleading requirements: (1) the confidential witnesses must be described with sufficient particularity to establish their reliability and personal knowledge, and (2) those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.  <u>Zucco</u>, 552 F.3d at 995.  This section deals only with the first prong of the test, whether Plaintiffs have "provided sufficient detail about the

1   confidential witness' position within the defendant company" to establish the reliability

2   and personal knowledge of the confidential witnesses.[10]

3   > The precise amount of detail required in describing confidential witnesses
    > varies based on the circumstances of the case.  Plaintiffs are not required to
4   > name witnesses. . . .  [However,] Plaintiffs must plead with substantial
    > specificity how confidential witnesses came to learn of the information they
5   > provide in the complaint.  The Court must be able to tell whether a
    > confidential witness is speaking from personal knowledge, or merely
6   > regurgitating gossip and innuendo.  The Court can look to the level of detail
    > provided by the confidential witness, the corroborative nature of other facts
7   > alleged (including from other sources), the coherence and plausibility of the
    > allegations, the number of sources, the reliability of the sources, and similar
8   > indicia.

9   Limatour v. Cray, 432 F.Supp.2d 1129, 1141-42 (W.D. Wash. 2006).

10          The SAC describes confidential witness 1 ("CW1") as "responsible for software

11  product development for both Motricity's carrier products and professional services

12  work" during 2011.  SAC at ¶ 81.  It further states that CW1 "was responsible for

13  software product development for both Motricity's carrier products and professional

14  services work" and supervised Motricity's software development staff.  As result, CW1

15  was familiar was Motricity's products and software projects.  According to CW1, (1)

16  Motricity's products did not provide full access to the Internet, (2) smartphone customers

17  had no use for Motricity's MobileCast product, and (3) Motricity underestimated the

18  marketing and technical requirements of its Asian carrier clients.  Id. at ¶¶ 81, 87.

19  Although the SAC does not include the exact dates of CW1's employment at Motricity

20  during 2011 and provides limited details about CW1's job responsibilities, CW1's first

21  _____

22  [10] The issue of whether Plaintiffs' reliance on the confidential witnesses is adequate to plead scienter as to
    each of Plaintiffs' claims is discussed in the following sections.

23

ORDER - 33

1    and third statements appear to be supported by his personal knowledge as a software

2    developer and supervisor.  Moreover, CW1's statement that Motricity's products did not

3    provide full internet access after the IPO is supported by other information in the SAC,

4    including the statements of the other confidential witnesses.  Id.  However, CW1's

5    statement that smartphone customers had no use for MobileCast appears to be an opinion

6    unsupported by personal knowledge.

7        Confidential witness 2 ("CW2") is described as being "responsible for sales to a

8    number of Motricity's carrier clients" during 2010 and the first quarter of 2011.  Id. at

9    ¶ 82.  According to CW2, carrier customers were not provided with unlimited internet

10   access and were instead provided with limited internet access subject to the carrier's

11   restrictions.  CW2 also states that Motricity's only smartphone application was

12   MobileCast, which did not allow users to search for content or information.  CW2's

13   statements appear to be based on his personal knowledge about Motricity's product

14   offerings, which he was familiar with as a salesperson responsible for procuring sales of

15   the mCore products to Motricity's carrier customers.  Id.  The Court concludes that the

16   SAC provides sufficient details about CW2's employment at Motricity for the Court to

17   rely on his statements.

18       The complaint describes confidential witness 3 ("CW3") as "responsible for

19   documenting technical changes made by Motricity customers to their systems in order to

20   maintain compatibility with Motricity's systems."  Id. at ¶ 83.  According to CW3,

21   Motricity's carrier customers used the mCore platform to provide "walled garden" access

22   to their subscribers.  It is unclear from the pleadings exactly what CW3's responsibilities

23

ORDER - 34

entailed and how they would have provided him with personal knowledge about how Motricity's customers utilized the mCore platform. The Court concludes that the limited details about CW3's employment at Motricity included in the complaint are insufficient under the PSLRA standard. The complaint lacks sufficient information for the Court to conclude how and when CW3 acquired his alleged knowledge. Id.

Confidential witness 4 ("CW4") worked at Motricity in 2010 and the first half of 2011, and "was responsible for maintaining content and storefronts for carrier portals." Id. at ¶ 84. He "confirms that Motricity's carrier portals did not provide unlimited internet access." Id. The complaint provides even less information about CW4 than about CW3. It does not include details about CW4's job responsibilities. For example it does not state which customers CW4 worked for, or what Motricity products (mCore, MobileCast, Marketplace, etc.) they used. Without additional details, the Court cannot determine that CW4 had personal knowledge to support his allegations.

To summarize, the Court concludes that the nature of CW1's work at Motricity, as a software developer, provided him with sufficient personal knowledge to support his statements about the functionality of Motricity's products after he joined the company in 2011. In addition, the Court concludes that CW2's work at Motricity as a sales person is relevant to the issue of functionality. However, the SAC does not provide sufficient details about the nature of CW3 and CW4's work at Motricity to support a finding of personal knowledge as required by the PSLRA.

ORDER - 35

1

### 3. *Post-IPO Statements Concerning Smartphone Compatibility*

2

The Plaintiffs allege that Defendants made actionable misrepresentations after the

3

IPO regarding the functionality of Motricity's mCore platform and Mobile Cast

4

products.[11]  Plaintiffs allege that Motricty made statements after the IPO that (1)

5

misrepresented that the mCore product provided access to the entire internet, and (2)

6

made the mCore and Marketplace products appear competitive with smartphone

7

technology and desirable for smartphone users.  However, rather than identifying each

8

allegedly false or misleading statement and then explaining contemporaneously why it

9

was false or misleading when made, the SAC consists of thirteen pages of selectively

10

excerpted quotes from a variety of SEC filings and analyst calls.  Plaintiffs then, often

11

without reference to a specific statement, argue that these statements were false and

12

misleading.[12]  Defendants argue these statements cannot support a claim because (1)

13

Plaintiffs fail to explain why the selected statements are false or misleading; (2) Motricity

14

adequately disclosed the risks to its business; and (3) the statements are non-actionable

15

puffery or protected by the PSLRA's safe harbor provision for forward looking

16

statements.

17

18

---

19

[11] Plaintiffs also allege that the same statements in the Registration Statement discussed above violate Section 10(b).  Plaintiffs' Opposition to Motricity Defendants' Motion to Dismiss at 18.  For the same reasons discussed above with respect to the Section 11 claims, the Court concludes that these statements do not violate Section 10(b).

20

21

[12] The Court has attempted to address each allegedly false and misleading statement quoted in the SAC. However, to the extent that Plaintiffs fail to provide any argument or analysis with respect to a particular statement, the Court is unable to address whether such statement is false or misleading.

22

23

ORDER - 36

1    In their Opposition to the Motricity Defendants' Motion to Dismiss, the Plaintiffs

2    identify the following statements as false and/or misleading:

3       The statement by CEO, Ryan Wuerch, in Motricity's August 2010 press
        release that Motricity's Marketplace "*enables users to find and purchase*
4       *all of the best content, applications, widgets and services available to*
        *them on the internet from one centralized user-center destination*."  SAC
5       at ¶ 48.

6       Motricity's September 2010 press release stating that MobileCast is a
        "*comprehensive offering . . . designed to give smartphone subscribers*
7       *real-time, zero touch access to all the relevant content, applications,*
        *goods and services they care about most, directly to their "phonetop*."  Id.
8       at ¶ 52.

9       The February 2011 statement by Wuerch during the Q4 2010 analyst call
        that "*Virgin smartphone subscribers will get real time zero touch access*
10      *to all of the relevant content, applications, goods and services they care*
        *about most directly to their phone top*."  Id. at ¶ 60.

11   Plaintiffs allege that these statements were false and misleading because Motricity's

12   products provided only limited internet access that was restricted to the information that

13   carriers provided through their portal.  Id. at ¶¶ 85, 91.  The Court disagrees.

14      "[W]hether an alleged misrepresentation 'is a statement of fact' or is instead 'mere

15   puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion."  Newcal

16   Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1053 (9th Cir. 2008).  "To determine

17   whether a statement is mere puffery, the Court must examine whether a statement is so

18   "exaggerated" or "vague" that no reasonable investor would rely on the statement when

19   considering the total mix of available information."  In re Metawave Communications

20   Corp. Sec. Litig., 298 F.Supp.2d 1056, 1090 (W.D. Wash. 2003) (citations omitted).

21   Similarly, a statement is non-actionable puffery if it is a "general, subjective claim,"

22

23

ORDER - 37

1   rather than a statement about "specific or absolute characteristics."  <u>Newcal Indus.</u>, 513

2   F.3d at 1053.

3        Here, what constitutes "all of the best content, applications, widgets and services,"

4   SAC at ¶¶ 48, 52, 60, is a matter of opinion.  This is not a statement about the "specific or

5   absolute characteristics" of the software.  As such, these are not statements that a

6   reasonable investor would rely upon when considering the total mix of information

7   available.  These statements are non-actionable puffery.

8        Plaintiffs do not discuss any of the other statements contained in the SAC in their

9   opposition brief.  However, the Court has examined the remaining statements quoted in

10  the SAC that appear to relate to the functionality of Motricity's product.

11       Plaintiffs appear to allege that the following statements concerning the adoption

12  by mobile carriers of Motricity's products for the smartphone market are false or

13  misleading.

14       [W]e signed a multi-year extension of our longstanding relationship with
         Verizon Wireless, which includes ***enabling the mobile internet across***
15       ***Verizon's newest smartphones*** such as the HTC Incredible and the Droid
         X."  SAC at ¶ 47.

16
         "During Q2, ***we continued to roll out mobile internet functionality across***
17       ***[Verizon's] handsets including two of their hottest Android smartphone***
         ***handsets, the Droid X and the HTC Incredible***."  <u>Id.</u> at ¶ 48.

18       The Court concludes that these statements are not false or misleading because

19  Plaintiffs have not alleged any facts to suggest that they are not accurate.  Plaintiffs have

20  pointed to no facts indicating that Motricity did not "enable the mobile internet" for

21  Verizon's HTC Incredible and Droid smartphones.  Plaintiffs' argument, based on

22

23

ORDER - 38

statements by CW1 and CW2 that the products were not ultimately useful or desirable for smartphone users, does not make the above statements of fact false.

The next statements involve the functionality of Motricity's products for the smartphone market.

> mCore Marketplace "***is an offering applicable to all types of mobile devices***, feature phones, ***smartphones*** and next generation devices. Marketplace broadens the availability of content to the entire mobile world, reflecting the new open world available to mobile subscribers, ***enabling them to have exactly what they want, when they want it.***" Id.

> "***I'm pleased to announce today too our first new carrier to adopt this exciting new product for the smartphone market is Virgin Media***. MobileCast is our next generation content management solution that leverages our intelligent architecture to deliver real time, consumer relevant content to a wide range of smartphones on the Virgin Media mobile network. Id. at ¶ 60.

Plaintiffs appear to argue that the above statements are false and/or misleading because they imply that MobileCast and Marketplace give smartphone users real time access to relevant information. They contrast this with the statements of CW1 and CW2 that Motricity's smartphone products were not desirable or relevant for smartphone users. However, Plaintiffs have not alleged that Marketplace was not available on a range of mobile devices or that it was not adopted by the Virgin Media mobile network. Nor can they allege that "what users want and when they want it" is a matter of fact. The essence of Plaintiffs' claim is that the products were not relevant to consumers. But what is relevant to an individual consumer is a matter of opinion. And the fact that Virgin Media adopted the product is uncontested. These statements are not false or misleading.

ORDER - 39

1    Finally, Plaintiffs also allege that the above quoted statements are false because

2   Motricity's MobileCast did not actually give smartphone subscribers access to the

3   internet but rather, allowed carriers and advertisers to "push" unsolicited content to

4   subscribers' phonetops.  SAC at ¶ 79.  This argument is unpersuasive because none of the

5   above statements address internet access.

6    In sum, the Court concludes that Plaintiffs have failed to adequately plead a

7   Section 10(b) claim with respect to the post-IPO statements concerning the functionality

8   of their products or their desirability for smartphones.  As such, the Court need not reach

9   the second prong of liability under Section 10(b), whether the statements were made with

10   scienter.  For the foregoing reasons, this claim is dismissed.

11        ### *4.  Post-IPO Statements Concerning Contracts with Asian Carriers*

12    Plaintiffs allege generally that Motricity made false and misleading statements

13   after the IPO concerning their contracts with XL Axiata and other Asian wireless carriers,

14   and the division of revenue within those contracts.  They also allege that Motricity failed

15   to disclose that its software would require extensive customization prior to deployment in

16   Asia.  The allegedly false statements are provided in context below.

17    In an August 3, 2010 press release, Wuerch was quoted stating "***we are***

18   ***capitalizing on the massive global opportunity for mobile internet users by adding XL***

19   ***Axiata . . .  as the first customer in our Asia Pacific region growth strategy***."  SAC at

20   ¶ 47.  In November, Weurch told investors that "***Motricity has the right technology, the***

21   ***right strategy, and the right roadmap to win substantial international opportunities***."

22   Id. at ¶ 56.

23

ORDER - 40

1    In the May 3, 2011, press release announcing its first quarter 2011 (Q1 2011)

2  financial results, Motricity stated the following:

3      "Motricity drove strong year-over-year growth in revenue and margin,"
       said Ryan Wuerch, chief executive officer of Motricity.  "*Our*
4      *international deployments with customers including XL, Celcom, Robi,*
       *Hello, Dialog and reliance are on track*, and managed services revenue
5      from new international customers grew 50 percent over the prior quarter.
       *These facts, along with very encouraging usage metrics such as XL's*
6      *recently reported 44% year-over-year growth in data revenue and 6*
       *million users on XL!Go powered by Motricity*, are strong leading
7      indicators of substantial international growth."  SAC at ¶ 63.

8       "*Our international mobile operator sales pipeline has grown ten-fold*
       *since this time last year, including targets in Southeast Asia, India, Latin*
9      *America and Europe with several at the final sales stage*."  Id.

10   Also on May, 3, 2011, Motricity held an analyst conference call to discuss its Q1

11  2011 financial results.  During the call, Motricity's CEO, Ryan Wuerch, made the

12  following statements:

13     "We expect the Q2 revenue will increase between $36 million and $38
       million and that our revenue will rapidly accelerate as we move through the
14     year, *given that our international operator rollouts are right on track*."
       Id. at ¶ 65.

15     "*[O]ur sales pipeline has increased tenfold since the same time last year,*
       *including very significant opportunities throughout Asia-Pacific region,*
16     *India and Latin America and other emerging markets.*  Though I can't be
       specific, I will say that we have several large operators in the Asia-Pacific
17     region that are at the final stages of the sales process."  Id.

18     "*Q1 we generated significant revenue from our second carrier in the*
       *Axiata Group, Celcom.  Celcom is the largest 3G mobile operator in*
19     *Malaysia with 11 million subscribers.  Rollouts for other Axiata*
       *operators, including Robi, HELLO and Dialog are all on track as well*."
20     Id.

21

22

23

ORDER - 41

A few weeks later, on May 17, 2011, Wuerch and Motricity's CFO, Allyn Hebner, participated in the Annual JP Morgan Technology, Media and Telecom Conference.  The conference materials stated the following:

> International deployments with XL, Celcom, Robi, Hello, Dialog and Reliance are on track.  Id. at ¶ 67.

By early 2011, Motricity had begun to see a decline in its domestic revenues and the company was strategizing how to address the rapid adoption of smartphones that was cutting into its domestic business.  Motricity Q4 2010 Earnings Conference Call, Escobar Decl. Ex. H, at 5, 18.  However, in its May 2011 Q1 earnings call, Motricity projected double digit growth in North American revenues over 2010 levels and strong international growth based on the continued "on track" rollout of its international contracts.  SAC at ¶ 65.

Finally, on November 14, 2011, Motricity issued a press release announcing its financial results for the third quarter of 2011.  In the press release, Motricity revealed poor financial results including a $7.6 million year-over-year decline in revenue, a $123.5 million reduction in goodwill, a $38.8 million charge for fixed and intangible assets, and $5.5. million in expenses related to non-profitable contracts.  Id. at ¶ 74.  The same day, Motricity held its quarterly call with analysts.  On that call, Motricity's interim CEO, Jim Smith, responded to the following question by a JP Morgan analyst:

> Q.  Okay.  *And, in terms of color around ex-Axiata, have we moved along faster than we had expected?  Or on target, below target?*
>
> A.  *Okay, so XL [Axiata] continues to stay on track*.  That has not changed.  We have launched Celcom, so they are in the early stages.  I believe we're currently on target, although early data is just coming in from

1    Celcom.  Not within the quarter, but we've recently gotten them along
2    [with D]ialogue, as well, down the launch path this month.  Id. at ¶ 78;
     Escobar Decl. Ex. P, at 8.

3         Plaintiffs argue that the above statements concerning Motricity's contract with XL

4    Axiata and its India and Asia Pacific operations were false and/or misleading because

5    Motricity announced the cancellation of the XL Axiata contract on January 5, 2012, and

6    two weeks later announced the cancellation of its operations in India and the Asia Pacific

7    region.  They argue that the termination of Motricity's Asian business operation supports

8    a reasonable inference that Motricity's earlier statements representing that its Asian

9    contracts were "on track" were false and misleading when made.  The Court disagrees.

10        Weurch's May 2011 statements that "***Our international deployments with***

11   ***customers including XL, Celcom, Robi, Hello, Dialog and reliance are on track***, SAC

12   at ¶ 63, and "***rollouts for other Axiata operators, including Robi, HELLO and Dialog***

13   ***are all on track as well***," SAC at ¶ 65, are intended to, and do, provide reassurance that

14   Motricity's Asian contracts were in good shape and moving forward on schedule.  The

15   November 14, 2011, statement by Interim CEO Jim Smith that the XL Axiata contract

16   was "on track" was made in response to a question by an analyst and appears to be

17   intended to assure her that the contract was moving forward on schedule.  However,

18   Plaintiffs only factual allegation supporting an inference that these statements were false

19   when made is the fact that Motricity left the Asian market in January 2012.  This

20   argument fails because fraud by hindsight is not actionable.  Metawave Communications

21   Corp. Sec. Litig., 629 F.Supp.2d at 1219 (W.D. Wash. 2009).  "The fact that [a]

22   prediction proves to be wrong in hindsight does not render the statement untrue when

23

1  made." In re VeriFone Sec. Litig., 11 F.3d 865, 871 (9th Cir. 1993).  The Ninth Circuit

2  recently reaffirmed this rule in In re Oracle Corp. Sec. Litig., concluding "the fact that

3  Oracle's forecast turned out to be incorrect does not retroactively make it a

4  misrepresentation."  627 F.3d 376, 389 (9th Cir. 2010).  Plaintiffs have not demonstrated

5  that the "on track" statements were false when made.

6         In addition, the Court notes that several courts have concluded that statements that

7  a company is "on track" are too vague to be actionable.  In Institutional Investors Grp. v.

8  Avaya, Inc., the Third Circuit Court of Appeals addressed whether statements that a

9  company was "on track" to achieve its financial goals and projections were actionable

10  under federal securities laws.  564 F.3d 242 (3d Cir. 2010).  The Court concluded that the

11  statements were non-actionable because they were "forecast-related," i.e. related to

12  whether the defendants would meet their financial projections in the future rather than

13  statements of current fact.  Id. at 246, 255.  The Court further concluded that, to the

14  extent that the statements contained assertions about the present, the "assertions of

15  current fact are too vague to be actionable." Id. at 254-56.  Similarly, in In re Royal

16  Appliance Securities Litigation, the Sixth Circuit concluded that defendants' statement

17  that "Royal [is] on track to have a terrific year," was properly dismissed as puffery.  1995

18  WL 490131, at *3 (6th Cir. 1995).

19         Here, Defendants' statements that Motricity's contract with XL Axiata was "on

20  track" are also too vague to be actionable.  A statement that a company is "on track" may

21  be actionable if it relates to a specific company objective and the plaintiff demonstrates

22  that the speaker knew that achieving the objective was not likely to occur.  Dura, 548

23

ORDER - 44

1    F.Supp.2d at 1140.  However, where the statement is a vague representation of optimism,

2    it is not actionable.

3          The Plaintiffs have also failed to plead facts supporting a strong inference of

4    scienter as required by the PSLRA.  In "determining whether the pleaded facts give rise

5    to a 'strong' inference of scienter, the court must take into account plausible opposing

6    inferences."  Tellabs, 551 U.S. at 323.  Because the Court must consider all reasonable

7    inferences, including ones unfavorable to the plaintiff, in determining whether a

8    complaint adequately alleges scienter, the inference of scienter must be "cogent and at

9    least as compelling as any opposing inference one could draw from the facts alleged."  Id.

10   at 324.  Here, Plaintiffs' argument that Motricity's eventual cancellation of its Asian

11   contracts supports an inference of scienter fails.  However, the Court is also mindful that

12   the Ninth Circuit recently cautioned that district courts "should look to the complaint as a

13   whole" and "consider the totality of circumstances" prior to dismissing a securities fraud

14   complaint for lack of scienter.  South Ferry, 542 F.3d at 784.  Plaintiffs additionally argue

15   that the statements of CW1 and the allegations of insider trading support an inference of

16   scienter with respect to the "on track" statements.  These arguments do not withstand

17   scrutiny.

18         CW1 claims that Motricity underestimated the amount of customization that was

19   needed to support the Indian and Asia Pacific carriers.  SAC at ¶ 87.  Taking this

20   statement as true, it does not support an inference that the contracts were not moving

21   forward on schedule in 2011 or were otherwise not "on track."  At most, it indicates that

22   the contracts may have required more work than anticipated.  This statement does not

23

ORDER - 45

1    support a reasonable inference that Wuerch, Smith or anyone else at Motricity knew, in

2    2011, that the Asian contracts were not "on track."

3         The SAC also alleges that certain stock trades by corporate insiders support

4    Plaintiffs' allegations of scienter.  SAC at ¶ 96.  The Ninth Circuit allows stock sales to

5    be used as circumstantial evidence of falsity or scienter when such sales are "unusual" or

6    "suspicious."  Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001).  However, "[i]nsider

7    trading is suspicious only when it is dramatically out of line with prior trading practices

8    at times calculated to maximize the personal benefit from undisclosed inside

9    information."  In re Silicon Graphics Securities Litig., 183 F.3d 970, 986 (9th Cir. 1999)

10   (internal quotation omitted).  "Among the relevant factors to consider are: (1) the amount

11   and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the

12   sales were consistent with the insider's prior trading history."  Id. (emphasis added).

13        The SAC alleges suspicious sales by five individual defendants, Allyn Hebner,

14   Richard E. Lee Jr., James Ryan, Jim Smith, and Ryan Weurch.[13]  The Court concludes

15   that these sales are not suspicious because the amount and percentages are not unusually

16   high, the timing is not suspicious, and there is no allegation that the sales were

17   inconsistent with the Defendants' trading history.  First, the Individual Defendants, with

18   the exception of Leigh, retained the majority of their holdings.  Further, although sales of

19   24 to 43 percent of a defendant's holdings may be somewhat high, they do not raise

20   _____

21   [13] The SAC also alleges suspicious sales by Chris Dorr.  However, Mr. Dorr, Motricity's Chief Human
22   Resources Officer, is not a named Defendant and therefore his sales activity is not relevant to the Court's
     determination of scienter.

23

1    suspicion when the Court considers the timing of the sales in this case.  The vast majority

2    of these sales took place in December 2010 and January 2011, immediately after the 180-

3    day post-offering lock-up period expired.  SAC at ¶ 96; Escobar Decl. Ex. T, docket

4    no. 88-20, at 3.  Because the Defendants were prohibited from making sales prior to this

5    time, the amount and timing of the sales is not significant or unusual.

6        Further, the Ninth Circuit has recently made clear that without an "allegation . . .

7    that . . . stock sales, though significant, are inconsistent with . . . usual trading patterns, no

8    inference of scienter can be gleaned from [the] stock sale assertions."  Zucco Partners,

9    552 F.3d at 1006.  Here, because the class period commences with Motricity's IPO, there

10   is no trading history for any of the Defendants.  Plaintiffs argue that the Court should

11   conclude that meaningful trading history is not required in a case such as this where the

12   lack of prior sales only reflects that defendants could not sell shares prior to the class

13   period.  However, the Ninth Circuit has held that "to create a strong inference of scienter

14   . . . the stock sales must be significant enough and uncharacteristic enough to cast doubt

15   on the [defendant's] motives."  Id.  Here, Plaintiffs' have failed to demonstrate that the

16   stock sales were either significant or uncharacteristic, given their timing immediately

17   after the post-IPO lock-up expired.

18       Although none of the SAC's allegations of scienter are individually cogent or

19   compelling enough to survive under the PSLRA, the Court must also "consider the

20   complaint in its entirety" to determine whether "all of the facts alleged, taken

21   collectively, give rise to a strong inference of scienter."  Tellabs, 551 U.S. at 322-23.

22   Even "[v]ague or ambiguous allegations are now properly considered as a part of a

23

ORDER - 47

1   holistic review when considering whether the complaint raises a strong inference of

2   scienter." South Ferry LP, No. 2, 543 F.3d at 784.  After reviewing the complaint in its

3   entirety, the Court is satisfied that the allegedly false and/or misleading statements

4   concerning Motricity's contracts with Asian carriers were not made with scienter.  This is

5   simply not a case where the allegations of scienter, although individually weak,

6   collectively give rise to a strong inference of scienter.  Instead, the facts alleged by

7   Plaintiffs to support scienter are both individually and collectively insubstantial.

8         The Court dismisses this claim.

9   **VI.    Section 15 and Section 20(a) Claims**

10        Section 20(a) of the 1934 Act and Section 15 of the 1933 Act concerning control

11  person liability both require underlying primary violations of the securities laws.  15

12  U.S.C. §§ 77o, 78t(a); see also No 84 Employer-Teamster Joint Counsel Pension Trust

13  Fund, 320 F.3d at 945.  Section 20(a) creates control person liability where there is

14  primary liability under Section 10(b) of the 1934 Act for

15        every person who, directly or indirectly, controls any person liable under
          any provision of this chapter or of any rule or regulation thereunder . . . to
16        the same extent as such controlled person to any person to whom such
          controlled person is liable. . . unless the controlling person acted in good
17        faith and did not directly or indirectly induce the act or acts constituting the
          violation or cause of action.
18
19  15 U.S.C. § 78t(a).  Accordingly, under Section 20(a), a defendant may be liable for

20  securities violations if (1) there is a violation of the Act, and (2) the defendant directly or

21  indirectly controls any person liable for the violation.  Howard v. Everex Sys., Inc., 228

    F.3d 1057, 1065 (9th Cir. 2000).  Similarly, Section 15 extends liability created under
22

23

ORDER - 48

1    Section 11 to "[e]very person who, by or through stock ownership, agency, or otherwise

2    . . . controls any person liable under [Section 11.]"  15 U.S.C. § 77o.

3         "Whether the defendant is a controlling person is an intensely factual question,

4    involving scrutiny of the defendant's participation in the day-to-day affairs of the

5    corporation and the defendant's power to control corporate actions."  In re BP Prudhoe

6    Bay Royalty Trust Sec. Litig., 2007 WL 3171435, *8 (W.D. Wash. 2007).  "Control" is

7    defined as "the possession, direct or indirect, of the power to direct or cause the direction

8    of the management and policies of a person, whether through the ownership of voting

9    securities, by contract, or otherwise."  17 C.F.R. § 230.405.

10        The fact that a person is a CEO or other high-ranking officer within a
          company does not create a presumption that he or she is a "controlling
11        person."  Rather, indicia of "control" include whether the person managed
          the company on a day-to-day basis and was involved in the formulation of
12        financial statements, which is sufficient to "presume control over the
          'transactions giving rise to the alleged securities violation.'"  Moreover,
13        actual authority over the preparation and presentation to the public of
          financial statements is sufficient to demonstrate control.
14
     S.E.C. v. Todd, 642 F.3d 1207, 1223 (9th Cir. 2011) (internal citations omitted).
15
          Here, because the SAC does not adequately allege primary violations under
16
     Section 11 and Section 10(b), the Court dismisses the control person claims under
17
     Section 20 and Section 15.  These claims are dismissed.
18
          **VII.    Conclusion**
19
          The Motricity Defendants' motion to dismiss, docket no. 86, and the Underwriter
20
     Defendants' motion to dismiss, docket no. 90, are GRANTED.  Plaintiffs' Section 11
21
     claims that the Registration Statement contained false or misleading statements about the
22

23

rate of smartphone adoption and the company's contract with XL Axiata are dismissed with prejudice and without leave to amend.  Plaintiffs' remaining claims are dismissed without prejudice and with leave to amend.  Plaintiffs shall file any amended complaint within ninety (90) days of the date of this Order.

IT IS SO ORDERED.

Dated this 17th day of January, 2013.

THOMAS S. ZILLY
United States District Judge

ORDER - 50